UNITED STATES DISTRICT COURT OF
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



United States Courts
Southern District of Texas
FILED

NOV 1 0 2004

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| MICHELLE ROD, INDIVIDUAL AND | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF RANDALL ROD, DECEASED, AND AS | § | |
| NEXT FRIEND OF BRIAN ROD, MINOR, | § | |
| ANGELA ROD, INDIVIDUALLY, | § | |
| BETHANY ROD, INDIVIDUALLY, AND | § | |
| LORRAINE M. ROD, INDIVIDUALLY | § | |
| | § | |
| VS | § | C.A.NO. 03-CV-5382 |
| | § | |
| FORD MOTOR COMPANY | § | |

## FORD MOTOR COMPANY'S MOTION TO EXCLUDE AND/OR LIMIT EXPERT OPINIONS FROM PLAINTIFFS' WITNESS GERALD ROSENBLUTH

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Defendant, Ford Motor Company ("Ford"), and files this Motion requesting that the Court apply the legal standards set forth below to the opinion testimony offered by Plaintiffs and, upon doing so, exclude or limit the testimony of Plaintiffs' expert Gerald Rosenbluth. In support thereof, Ford would respectively show the Court the following.

### I.

### SUMMARY OF RELIEF SOUGHT

This products liability lawsuit arises out of an occurrence on Friday, May 5, 2000, when Randall Rod, the 42 year old owner of a four wheel drive, heavy duty Ford F350 diesel engine pickup truck was found, late at night, deceased, lying partially underneath his running vehicle. Mr. Rod was alone at the time he died. Moreover, Mr. Rod was alone at the time he apparently decided to crawl under his own truck, on a sloped driveway, without turning the vehicle off or securing the parking brake. There are no witnesses to Mr. Rod's actions immediately prior to

92350.2

exiting the vehicle, nor when he placed himself beneath it. Similarly, there are no witnesses to the actual events which transpired once Mr. Rod was under the vehicle. Nonetheless, Plaintiff's principal liability witness, Gerald Rosenbluth, has constructed an elaborate theory, based on surmise and speculation, that Mr. Rod chose to crawl beneath his vehicle because he perceived a malfunction of his vehicle's 4-wheel drive system and, while he was in that position, the vehicle experienced a malfunction in the truck's four wheel drive transfer case so rare it had never been seen before, nor replicated since[1]. Gerald Rosenbluth's opinions all hinge entirely on this premise.[2]

Plaintiffs plan to offer into evidence opinion testimony from Gerald Rosenbluth ("Rosenbluth") on the issues of product defect and alternative design. Rosenbluth's testimony does not meet the basic requirements for admissibility of expert testimony established by Federal Courts, nor has Rosenbluth developed any competent, admissible evidence to support his theory of how Mr. Rod died. Instead, Rosenbluth has offered shifting, and often contradictory opinions about the "defect" in the design of this truck which he says allowed it to roll back onto Mr. Rod.[3]

---

[1] There is an extensive underlying factual record in this case. Ford has not inserted a lengthy recitation of facts here. Rather, the significant facts about the occurrence in question, the subsequent police investigation, and the findings of that investigation which shed additional light on the merits of Ford's Motion have been compiled and attached as Appendix "A", along with the excerpts of the factual record cited therein for the Court's ready reference and ease of use.

[2] An in-depth understanding of transfer case technology and function is probably not essential to understanding the legal merits of this Motion. However, for the Court's reference and if needed, Ford has provided Appendix "B", which provides a much more in-depth description of the product, it's significant sub-assemblies, and their basic functions, which may prove useful to the Court in parsing Mr. Rosenbluth's many "defect" claims and interpreting his technical jargon.

[3] Finally, Ford has included, at Appendix "C", a detailed discussion of the evolution of product "defect" allegations which Ford has faced and defended in this lawsuit, including those proffered by Gerald Rosenbluth. Rosenbluth is at least the third "expert" retained by Plaintiffs' counsel to buttress a defect claim. A dizzying array of opinions have been put forth over the long life of this lawsuit: too many, in fact, to burden the Court with in the body of this Motion. Ford believes, however, that it is important the Court have full access to a complete picture of the scattershot approach to "defect" which has been the hallmark of this litigation, and which has culminated in this Motion. Appendix "C" consists of Ford's summary of that history, documented with citation to the evidentiary record.

92350.2

Prior to his August, 2004 deposition, Rosenbluth had filed two separate expert witness reports in this case. In each of those earlier reports, he had articulated a somewhat different theory of the supposed "defect". During deposition, he devised yet a third, brand new theory of this "defect." The only common thread running through all of these offerings has been that some "defect" in the design of the electronic shift-on-the-fly (ESOF) transfer case in this four wheel drive pickup truck caused it to roll onto Mr. Rod while he was lying beneath it. Rosenbluth's theories about what went "wrong" inside the transfer case are the moving targets, each new theory evolving, Ford believes, as its predecessor met its undoing at the hands of the evidence.

Nonetheless, Rosenbluth has not revised or withdrawn any of his prior testimony or reports. Ford concludes, therefore that he is still willing to offer this Court no less than *eleven* (11) opinions via his reports, and a *twelfth*, entirely novel opinion, first revealed in the midst of his deposition, which hinge upon, and cannot stand apart from, his <u>central thesis</u> that the transfer case in this vehicle can, and did, achieve what he has repeatedly characterized as a *"...sudden unexpected, inadvertent and catastrophic momentary, neutral event"*, which he asserts can override the transmission park safety feature and allow the vehicle to free roll, which was a direct and producing cause of Mr. Rod's death.

## II.

### <u>Summary of Disputed Opinions Of Gerald Rosenbluth</u>

As the Court will see in the balance of this Motion, none of the enumerated opinions satisfy the basis of expert testimony established by the Federal Courts, and therefore are insufficiently reliable to be admitted. Ford, therefore, respectfully seeks to have the Court limit, or exclude any of the following opinion testimony from Gerald Rosenbluth:

(1)     that the 4X4 ESOF transfer case on the subject Ford F-350 truck operated in a manner other than as designed at the time of the occurrence which killed Mr. Rod;

(2)     that the ESOF transfer case was defective, unreasonably dangerous, or unsafe for its intended purpose at the time of this occurrence;

(3)     that a sudden, unexpected "neutral event" was encountered in the transfer case, which allowed it roll back and entrap Mr. Rod at a time when he was lying prone under the vehicle, downhill of the front axle and tires;

(4)     that the presence of the 4WD low indicator light on the truck's instrument cluster, "while the control knob showed two wheel drive" suggests a "probability that the gear selector forks produced a momentary, sudden, unexpected, catastrophic and unintended neutral mode.";

(5)     that there is a "reasonable probability of an electro-mechanical malfunction in the transfer case Generic Electronic Control (GEM) controller mechanism, potentially enhanced by drive train torsional (sic) elements and/or vehicle vibration/weight transfer. ";

(6)     that there is a "reasonable probability" that a mechanical condition inside this ESOF transfer case, (perhaps "exacerbated" by range fork pad wear and/or "dampness" in the motor controller's electrical connectors), resulted in an, "abutting" of the transfer case "gear teeth", so that a mechanical "skip lock" situation occurred, which caused the vehicle's transfer case to achieve a "momentary neutral mode" and override the transmission "park", while Mr. Rod was in a position under the vehicle which would allow the vehicle to roll rearward onto him. (*Note*: this is the theory that came up for the first time during deposition. *See, e.g., Rosenbluth Depo., 121:23- 123:12; 126:4-12,130:1-131:5 attached as Exhibit 2)*;

(7)     that the transfer case failed to properly shift from 4WD Low at the time of this occurrence, resulting in Mr. Rod's death, due to "the extremely deteriorated condition of the range selector fork 'pads'", or that this alleged deterioration of those pads "would, more likely than not, compromise the shift selection durability and reliability on an intermittent basis, causing a momentary neutral condition inducing a free roll mode...";

(8)     that the transfer case failed to properly shift from 4WD Low at the time of this occurrence, resulting in Mr. Rod's death, due to an intermittent electrical malfunction of the "connectors to the GEM undercarriage componentry (sic)" or that such an alleged electrical malfunction caused the transfer case to achieve a "momentary" and/or "intermittent" neutral mode";

92350.2

(9)     that the "non-appearance of the failure codes during the post-accident NGS download [at the police impound lot] would *not* be indicative of the pre-accident conditions" or that these codes would have been set, but were more likely than not erased when "the subject vehicle was turned off and restarted 3x + prior to the download...";

(10)    that Ford did not provide adequate warnings and information with the vehicle "since it did not provide caution, warning or danger notifications nor consequence of the action referencing potentially foreseeable intermittent and momentary neutral events in the transfer case.";

(11)    that "technologically and economically feasible alternative designs would reduce/minimize and/or eliminate the dangers associated with a sudden, unexpected and potentially catastrophic transfer case Neutral condition bypassing the safety feature of transmission Park mode...", along with any discussion of such allegedly "safer" alternative designs or theoretical modifications for which he has no proposed design, has shown no prototypes or production models, nor offered evidence that any such proposed alternative design has ever been built, assembled or developed, or would work to eliminate the alleged "defect"; and

(12)    that Ford was under some legal duty, or failed to discharge a legal duty to "issue a 'recall campaign' or provide a 'Technical Service Bulletin' with regard 'to the range shift fork redesigned pads'".

As demonstrated in more detail below, each of these opinions is based on nothing more than subjective belief and speculation on the part of Rosenbluth.  Indeed, an examination of the tortured history of this case – with Rosenbluth's endless struggles to find a theory of defect that does not unwind when placed under scrutiny – demonstrates the manner in which Rosenbluth has turned the *scientific method* on its head.  First he assumes that there must be a defect (because that is his "job" in this case) and then he casts about in the dark for a "defect" explanation.

92350.2

## III.

### LEGAL ARGUMENT AND AUTHORITIES

**A.    OPINIONS WHICH SHOULD BE EXCLUDED**

Ford seeks to exclude the twelve expert opinions which are set forth specifically above, as well as any related opinions which Rosenbluth seeks to offer the time of trial, which in any way restate or rely upon excluded opinion testimony.  This witness is not qualified to render certain of the opinions offered, while other opinions are not based on any reliable foundation in science or fact.

Moreover, none of the Rosenbluth theories (or his opinions based on those theories) have been tested in a manner which replicated the defect which he claims caused Mr. Rod's death, despite his admissions that he has never before encountered an alleged design defect in any ESOF transfer case, has never previously analyzed such a mechanism for potential design defects, has no knowledge of any other similar incidents, and has never designed any part of a transfer case himself.  (**Exhibit 2**, Depo., 75:16-76:7).  In Rosenbluth's own words:

> *"I have not been able to reproduce it [a sudden unexpected, inadvertent and catastrophic momentary, neutral event] electronically or mechanically as I believe it would have occurred in the Rod vehicle".*

*(Exhibit 2*, Rosenbluth Depo., 92:5-7)

Rosenbluth's abject failure to perform any meaningful testing, investigation or analysis which supports his theories, renders his opinions inadmissible both because they lack foundation and because they were formed with fatal "analytical gaps."  These gaps are well illustrated by the following admissions and omissions in the record:

- Rosenbluth never worked in any capacity with an identical or exemplar transfer case before reaching his conclusions that the transfer case had the *".. potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event as was more likely than not*

92350.2

*achieved in the transfer case".*  (See, **Exhibit 1**, Rosenbluth Report, 2/25/04, "Conclusions and Opinions", pp. 7, attached).

▪ Rosenbluth has never demonstrated by testing or experimentation that this so-called *"potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event" could* actually occur in the Rod vehicle, but instead admitted that he was not able to reproduce this phenomenon in the Rod truck: *"I have not been able to reproduce electronically or mechanically as I believe it would have occurred in the Rod vehicle". (See,* **Exhibit 2**, Rosenbluth Depo., 92:5-7)

▪ Rosenbluth "tested" an exemplar vehicle, but likewise could not demonstrate that this exemplar vehicle could be made to experience the so-called *"potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event", (***Exhibit 2***, Rosenbluth Depo., 92:5-7)

▪ Rosenbluth has never tested, and cannot prove through the use of competent admissible evidence, his theory that this so-called *"potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event"* could be caused by "excessive" wear in the range fork pads. *(*Rosenbluth Depo. 92:5-7)

▪ Rosenbluth has never tested, and cannot prove through the use of competent admissible evidence, his theory that this so-called *"potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event"* can be caused by "dampness" in the GEM's electrical contacts, and in fact he admitted he could *not* test this assumption. (**Exhibit 2**, *Rosenbluth Depo.*, 120:16-121:6)

▪ Rosenbluth flatly admits his theories that moisture or dampness in the electronic GEM controller could cause this so-called *"potential to exhibit a sudden unexpected, inadvertent and catastrophic momentary, neutral event" cannot* be elevated a reasonable scientific certainty by any available testing, investigation or the evidence. Rather, he admits that: *"I cannot tell you that on that day [of this occurrence], within a reasonable degree of scientific and technological certainty, that moisture within the [GEM] connectors caused the encoder to fail and caused this accident."* (**Exhibit 2**, Rosenbluth Depo., 39:13-40:13).

▪ Rosenbluth concludes that prior to the time Rod crawled underneath this truck, its transfer case "began" the process of shifting out of 4WL range, but "doesn't complete that" and "doesn't come back".  Yet he admits he "can't tell [the jury] specifically what's going to stop it from completing, but [that] it [the transfer case] doesn't achieve a neutral".  (**Exhibit 2**, 120:11-19). More significantly, however, is his bare assertion that there are several  "reasonable probabilities" to support his theory that the

transfer case behaved in this fashion, but that he "can't test them all." (**Exhibit 2**, 120:20-121:5). He then turns around and admits what he has just characterized as "reasonable probabilities" for explaining this alleged aberrant behavior are nothing more than mere, unproven "hypotheses", about which he "can't be specific". (**Exhibit 2**, 121:3-6)

- Rosenbluth next concludes that once Rod was fully underneath this truck, the transfer case then "falls into neutral" (**Exhibit 2**, 120:11-19). When asked to explain how this could have occurred, Rosenbluth speculates that it was "engine, vibration, things of that nature", but once again is forced to admit he cannot replicate this key facet of his analysis by testing or experimentation, either. (**Exhibit 2**, 122:23-123:12)

- Rosenbluth voiced in the early stages of his deposition that he would "tell the ladies and gentlemen of the jury that wear on the pads *did cause* or contribute to the failure mode" (**Exhibit 2**, Rosenbluth Depo, 40:8-12) and, therefore, played a role in the so-called "sudden unexpected, inadvertent and catastrophic momentary, neutral event," but later completely impeached himself. When asked: '[c]an the momentary neutral event occur if the pads are *not* worn', Rosenbluth replied: *'yes'*. (**Exhibit 2**, 148:3-5)

- Moreover, in mid-deposition, Rosenbluth birthed an entirely *new* hypothesis about how this event occurred, which he admits *does not* "need the [worn] pads" nor "need a damp or wet or muddy electrical connection to get the momentary neutral event" (**Exhibit 2**, Rosenbluth Depo., 48:8-11). He calls this new theoretical iteration the "skip lock" theory, and concludes the truck rolled because the transfer case achieved a "quasi-neutral" condition which occurred when the "gear teeth" in the transfer case first "partially engaged", then disengaged and "skipped from tooth to tooth" (while Rod was lying underneath), before "skipping" back into an engaged position, prior to when the police arrived to investigate and found the truck's wheels locked in park. (See, generally, **Exhibit 2**, Rosenbluth Depo.,126:2-146-18)

- Obviously, Rosenbluth has not tested, and consequently has no foundation for, his revised theory that "skip-lock" caused this occurrence. Nonetheless, he now asserts that "skip lock" is "more likely than not" what occurred in this event. (**Exhibit 2**, Rosenbluth Depo.,130:5-22). Under this revised scenario, "pad wear" is characterized as merely a condition which "would exacerbate", and/or "increase the probability of something like that [the Rod occurrence] happening", although he had already ruled out pad wear as a predicate to achieve the "momentary, neutral event". (Id., 153:14-21, 148:3-5)

92350.2

- 8 -

- Rosenbluth admits there were "multiples of thousands" of Ford units equipped with this ESOF transfer case sold, but that he could not find one single reported incident of an "intermittent neutral event" reported in government data bases, Ford's records or other sources normally relied upon by experts in automotive products. (**Exhibit 2**, Rosenbluth Depo., 148:16-149:6,152:15-153:7). And, he admits that there is no evidence that anything even remotely similar had occurred in the Rod vehicle prior to or after this event (**Exhibit 2**., 151:11-16) and there is no evidence of any service problems related to the truck's transmission or transfer case prior to the event. (**Exhibit 2**, 151:17-20)

- Rosenbluth was not designated as an expert in any field relating to the adequacy of warning labels or human factors; therefore, there is no foundation for any testimony from him in this regard, despite gratuitous testimony about warnings and failures to warn found in his first and second expert reports, as well as in his deposition testimony. For example, he voices the opinion that the "ESOF transfer case has a hidden or concealed neutral position . . .[so that] Ford had an obligation to instruct or warn." (See, Plaintiffs' Eighth Supplemental Designation of Expert Witnesses, attached hereto as **Exhibit 3**, Reports of Gerald Rosenbluth, attached as **Exhibit 1**, and Rosenbluth Depo., 18:12-18, attached as **Exhibit 2**)

- Rosenbluth is not qualified to offer his opinions or "analysis." He is not an engineer, has no scientific degrees, has never designed an ESOF transfer case and never analyzed the alleged failure of an ESOF transfer case. (**Exhibit 2**, Rosenbluth Depo., 14:17-15:17; 75:16-18; 75:19-23)

**B.     RULES GOVERNING THE ADMISSIBILITY OF EXPERT TESTIMONY**

**1.     THE RULES APPLY TO ALL WHO CALL THEMSELVES "EXPERT": GERALD ROSENBLUTH'S CREDENTIALS DO NOT QUALIFY HIM TO TESTIFY**

The Federal Rules of Evidence require the Court ensure the expert's reasoning and methodology is scientifically reliable and relevant to the facts in issue. *Daubert v. Merrill-Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The Supreme Court is clear that judges must undertake this gate-keeping obligation with diligence, even though it "will sometimes ask judges to make subtle and sophisticated determinations about scientific methodology and its relation to the conclusions an expert witness seeks to offer." *General Electric Co. v. Joiner*, 522 U.S. 136, 147 (1997) (Breyer, J., *concurring*), and applies to *all* expert testimony, whether based

92350.2

on scientific, technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999):

> [W]hether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

*Kumho Tire*, 526 U.S. at 149 (quoting Hand, L., Historical and Practical Considerations Regarding Expert Testimony, 15 Harv.L.Rev. 40, 54 (1901)).[4]

Perhaps the least subtle of these determinations, however, is that requiring the purported "expert" actually *be* an expert because of his or her specialized education, training or experience in the precise matters upon which he or she purports to give "expert" opinions. *See, Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 719 (Tex. 1998). The offering party bears the burden

---

[4] As always, Federal Rules of Evidence 702, 703 and 705 govern the admissibility of expert opinion in this matter:

**RULE 702. TESTIMONY BY EXPERTS**
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case (emphasis added)*.

**RULE 703. BASES OF OPINION TESTIMONY BY EXPERTS**
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

**RULE 705. DISCLOSURE OF FACTS OR DATA UNDERLYING EXPERT OPINION**
The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to [disclose?] the underlying facts or data on direct examination.

92350.2

of proof under Rule 702. *See, e.g., Wilson v. Woods,* 163 *F.3d 935 (5th Cir. 1999), also Gammill, 972 S.W.2d* at 718 (citing *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex. 1996)).

In *Gammill,* the Texas Supreme Court upheld the exclusion of a mechanical engineer in a products liability case who purported to be an expert in the design and manufacture of automobiles and their component parts. The court in *Gammill* emphasized that not every mechanical engineer is qualified to testify as an expert in every products liability case, pointing out that the expert at issue, although experienced in designing and testing fighter planes and missiles, had no training or experience in the design or manufacture of automobiles or their relevant components. Because the expert had not been shown to have any expertise that would qualify him to testify about design defects in a vehicle's accelerator or restraint system -- the actual subject matter of his testimony -- he was disqualified to testify. *See id.* An expert simply must have specialized knowledge regarding the specific issue upon which his testimony is offered in order to qualify as an expert and thereby render his opinion testimony admissible. *See, also Broders,* 924 S.W.2d at 153.

Likewise, Federal Rule of Evidence 702 requires that any witness expected to testify regarding specialized knowledge must be "qualified" as an expert. If the court finds that the witness is not qualified to testify in a particular field or on a given subject, the testimony should be excluded. *See, e.g., Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999).[9] Tellingly, unlike Gerald Rosenbluth, the excluded witness in *Wilson* was actually a mechanical engineer by education, but failed to show how his training and education *as an engineer* had qualified him in the area of accident reconstruction. (*Id.* at 938) The court recognized that if *this* engineer was qualified, then *any* engineer - in fact, any person with a scientific or mathematical background -

---

[9] In *Wilson,* the court affirmed the exclusion of this witness because he was not qualified to render an opinion on accident reconstruction 163 F.3d at 937-38.

92350.2

may be qualified. (*Id.*) Because the engineer in *Wilson* had never taught classes on accident reconstruction, was not certified as an accident reconstruction specialist, never experimented or conducted studies in the field, and had never been published on the subject, he lacked the experience, training and expertise to testify. (*Id.*)

Rosenbluth simply is not qualified to offer the opinions he purports to offer in this case. This will become abundantly clear throughout the remainder of this motion, his deposition and the attached appendices. His lack of understanding regarding the basic design and function of the vehicle systems at issue in this case and the lack of any reliable testing or analysis to support his opinions only serves to underscore that he is not, in fact, qualified to render opinions about alleged "defects" in the ESOF system on the subject vehicle.

For example, Rosenbluth is not an engineer. He did undergraduate study at NYU in industrial design and technology, and received a Bachelor of Arts Degree and a Master's Degree from the Arizona State University School of Education. He holds no science degrees (**Exhibit 2,** Rosenbluth Depo., 14:17-15:17). He has never been consulted to examine alleged defects in another ESOF transfer case (**Exhibit 2,** 75:16-18). He has never conducted any prior research or analysis of transfer case design, performance or function where he concluded that a defect in the transfer case caused or contributed to an injury or death (**Exhibit 2,** 75:19-23). He has never been involved in the mechanical design of any transfer case, nor in the software strategy design for controlling an electronic transfer case. (**Exhibit 2,** 75:24-76:10) In short, Mr. Rosenbluth is not a professional automotive or mechanical engineer by education, training or experiences. He is a professional witness, having been retained in "perhaps 500" lawsuits in the last 10 years in which an automobile manufacturer was named as the defendant. (**Exhibit 2,** 76:8-14)

92350.2

While there may have been a time when Rosenbluth's "jack of all trades, master of none" approach would have been acceptable in either the State of Federal Court of Texas, both the Fifth Circuit Court of Appeals and the Texas Supreme Court have made it clear that it is no longer acceptable to allow experts to offer opinion testimony unless the testimony is genuinely based on specialized knowledge regarding the <u>specific issue</u> upon which his testimony is offered. See, e.g. *Broders*, 924 S.W.2d at 153, *Wilson* 163 F.3d at 937.

## 2. THE GATEKEEPING FUNCTION ANSWERS THREE KEY QUESTIONS.

Next, in order to be admissible, expert testimony (from a qualified expert) must be "not only relevant, but reliable," and District Courts are the "gatekeepers" who must make that determination. *See, Daubert*, 509 U.S. at 597; *see also Kumho Tire*, 526 U.S. 137; *Joiner*, 522 U.S. 136. Gate keeping is not a new function: it has been long standing under Fed. R. Evid. 702 that each opinion put forth by a competent "expert" must be balanced on a trident of reliability: (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, which (3) ensures that the principles and methods are applied reliably to the facts of the case.

Were this Court to conclude that Rosenbluth was qualified to speak to the specific issues of transfer case design and function, then the sole inquiry before this Court becomes whether Mr. Rosenbluth's explanations rest on a "reliable" foundation in science and facts. *Daubert* defines the evidentiary standard of "reliability" required in Rule 702 in the negative; that is, it holds expert opinions are ***unreliable and inadmissible*** unless they are:

    (1)    ***grounded in scientific method,***

    (2)    ***constitute more than a mere subjective belief***, are

    (3)    ***relevant to***; and

    (4)    ***fit the facts of the case in question. Id.***, 509 U.S. at 589-590.

92350.2

Ford, therefore, respectfully suggests that the three key questions when it comes to discharging the gatekeeping function, and judging the reliability of Mr. Rosenbluth's opinions, are:

**Key Question 1:**      ***Did Rosenbluth use a reliable method?***

**Short Answer 1:**      *No.* Rosenbluth's "***sudden, unexpected, inadvertent, catastrophic momentary neutral event***" theory is based on subjective belief and conjecture, and not on testing, experimentation, data or other scientific or technical methodology which is replicable or capable of providing repeatable results. Moreover, extensive testing of the Rod vehicle transfer case which occurred in the forty-one months following this event all points to the opposite conclusion that the transfer case, at all times, before and after this event, operated as designed. (See, generally, Appendix "A", "Significant Facts", Appendix "B", "Ford's Product," and Appendix "C" Background Summary: Plaintiffs "Expert Analysis of Product Defect")

**Key Question 2:**      ***Are Rosenbluth's opinions grounded in scientific method?***

**Short Answer 2:**      *No.* Rosenbluth's conclusions are based on advocacy, not science, experience or any specialized technical know-how in transfer case technology. He brings no data or application of accepted methodology to support his causation conclusion. The record is replete with examples of Rosenbluth's determination to make this event the fault of the transfer case, without regard to the lack of scientific method or proof, and in spite of the extensive body of work and circumstance which points to the opposite conclusions. (See, e.g., Appendix "C", "Background Summary:

92350.2

Plaintiffs' "Expert" Analysis of Product Defect"). Rather than seek to test his theories by attempting to disprove them, Rosenbluth has decided not to test them at all.

**Key Question 3:**     *Does Rosenbluth reach conclusions which "fit" the facts.*

**Short Answer 3:**     *No.* His conclusions fly in the face of the facts. (See, generally, Appendix "A", "Significant Facts")

Courts since *Daubert* have subjected expert testimony to strict scrutiny, making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and then, whether that reasoning or methodology properly can be applied to the facts in issue. *See, e.g., Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999). When this Court does that, the basis for Mr. Rosenbluth's opinions evaporates and he falters on all three of the key *Daubert* questions, as summarized above, and set out more specifically, with full citation to authority, below.

### 3.    ROSENBLUTH'S METHOD IS UNRELIABLE AND HIS CONCLUSIONS ARE NOT GROUNDED IN SCIENTIFIC METHOD.

The *Daubert* Court specifically stated that an expert's opinion must be based on "methods and procedures of science" rather than on "subjective belief or unsupported speculation." *Id.*, 509 U.S. at 590. If the data used to reach the conclusion does not have sufficient probative force and reliability so that a reasonable expert could rely upon it, the opinions must be excluded. *Paoli*, 35 F.3d at 748, *quoting In re "Agent Orange Product Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y. 1985).

Furthermore, an expert's bare opinion will not suffice. In *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir. 1997), the court reversed a judgment in favor of the plaintiff

92350.2

because the plaintiff's expert's testimony was unreliable. (*See Id.* at 304-5). There, the expert opined that the seat belt involved in the accident showed marks of "loading" that were caused by an accident in June of 1989, rather than the later incident in which plaintiff's injuries occurred. (*See Id.* at 304). Like Rosenbluth, the expert's opinion was based on a visual inspection of the product, which occurred more than two and one-half years after the event, but no testing or other scientific, systematic or replicable analysis. (*See Id.)* [5] The Wilson expert's opinions [6] were held unreliable because they were not derived by a scientific method *that was capable of validation. (See Id.* at 304, 305).

An opinion not based on "good science" is not admissible. It is, to borrow a phrase, "junk science". The clear lesson of *Smelser* is *any* opinion can be deemed junk science if (1) it is not based on tests; (2) the expert cannot explain the failure to test, (3) the expert has failed to adequately document his testing method and outcomes so that they could be replicated and validated; and/or (4) the expert has even failed to discover, use or consider whether the physical or operational characteristics of the product conform to the theory. (*Id.* at 304, 305).

Rosenbluth's opinions (in their entirety) miss the mark on all four *Smelser* criteria. He has based his entire theory about the alleged momentary and transient "electro-mechanical" malfunction of the transfer case, or in the alternative an "intermittent neutral" due to "skip lock", on observations gathered in a *single* visual inspection of the transfer case, nearly three and one-half years after the night in question, and following *at least 100 additional successful tests* of the same unit, all *without*

---

[5] The expert's examination consisted of a visual inspection, *and he did not conduct any testing at all on the belt. See id.* The expert also opined that the lap belt was not defective but the shoulder belt was, despite the fact that his testing was admittedly inconclusive as to the lap belt and was questionable as to the shoulder belt. *See id.* Finally, the expert opined that the mounting plate on the shoulder strap was mounted at an improper angle, despite admitted flaws in his testing. *See id.* Specifically, the expert acknowledged that his results would be flawed if the plate was not mounted at a certain angle, yet he never determined the angle of the plate on the vehicle involved in the accident or the factory specifications for the mounting of the plate. *See id.* Further undermining his work, the expert admitted that although he performed his test approximately one hundred times, he only took measurements five or six times. (*See Id.)*

[6] That the shoulder belt, but not the lap belt, failed in the second accident.

92350.2

- 16 -

*failure* or malfunction (See, generally, Appendices "A", "B" and "C"). Not only has he failed to "test" and validate this alleged phenomenon, or cogently explain his own lack of testing, he has utterly failed to explain *why all the tests which have been conducted* (over 100 on the transfer case and 500 more on the transmission, as well as the entire police investigation) have *consistently* shown this truck's drive train to be operating *exactly as designed*, with no "momentary" or "intermittent" neutral events. Rosenbluth has not documented his "testing" because he will not (and Ford suspects, cannot) design or execute a "test" which could prove this theory has any merit whatsoever. And he even plans to pull the wool over this Court's and the jury's eyes by suggesting, as he notes in both his second report and his later deposition, that the GEM module "probably" did record and store fault codes (indicating a mechanical or electrical problem with the transfer case on the night of this occurrence), which were later "erased" by the police turning the truck on and off a *mere three times*, when it requires *eighty (80)* cycles for that to occur. Moreover, he has built his entire theory on the rank speculation that the transfer case was physically attempting to shift up at the time Mr. Rod exited the vehicle, because of the presence of the "4WD Low" indicator light on the dash. (See generally, Appendix "C"). Both of these examples display his startling lack of familiarity with the operational characteristics of this ESOF transfer case.

4.    ROSENBLUTH'S CONCLUSIONS DON'T "FIT" THE FACTS.

Even an expert who is qualified to render an opinion regarding a particular subject, and has employed reasonable and accepted methods in doing his work, must nevertheless show that the resulting conclusions are not at odds the accurate, knowable and relevant facts, in order to be admissible. While *Daubert's* focus is primarily on principles and methodology, "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146; *Kumho Tire*, 526 U.S. at 157 (district courts must "scrutinize" whether even reasonable or reliable principles

and methods have properly been applied to the facts of the case to reach a valid conclusion). Thus, it falls to the District Court to examine the expert's work for "good" conclusions. That is, whether those conclusions could "reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). If the court concludes that there is simply too great an *"analytical gap"* between the facts and the expert's conclusion from those facts, the opinion should be excluded *Joiner*, 522 U.S. at 146; *see also Moore*, 151 F.3d at 276 ("a district court, while acting as a gatekeeper for expert evidence, must evaluate whether there is an adequate 'fit' between the data and the opinion proffered").

Rosenbluth's "conclusions" in this matter suffer an analytical gap that even Evel Kenevel could not jump. He has, in fact, ignored the most reasonable explanation of how the truck was able to roll onto Mr. Rod at this time and place.[7]

The facts are clear: despite repeated testing of Mr. Rod's vehicle, no neutral condition in the transfer case which would allow the vehicle to roll was ever replicated, by anyone. Testing conducted on a mock-up of the F-350 transfer case, and on exemplar vehicles, likewise produced

---

[7] This was a tragic, but unprecedented, occurrence. Ford believes that, if we accept the testimony of witnesses at the scene as true, and accept that no one moved the vehicle's transmission from "neutral" into "park" before the police arrived, then the most probable reason the truck moved is that after Mr. Rod placed himself under the vehicle (for reasons which will likely never be known despite the speculation that he detected a problem with the 4WD transfer case), he came in contact with the outer manual control lever on this 4R100 transmission, which is connected to the mechanical shift linkage cables (transmissions on every vehicle have such a lever for service use). With his left hand, he probably grasped the lever, either to gain leverage to change positions in that cramped space, or perhaps deliberately, and pulled it forward (toward the front of the truck) with sufficient force to release the park pawl from the park gear. In essence, he used this lever on the transmission's housing to shift the transmission manually out of Park while underneath the truck, which caused it to begin to roll. Because the park brake was not set and the wheels were not obstructed on this sloped driveway it rolled downhill, towards Rod's torso. The truck's rearward movement pulled the lever out of his hand as the vehicle rolled downhill. The transmission, free of the external force Mr. Rod had applied, returned to the park detent position, allowing the park pawl to engage the parking gear as the truck's speed decreased to be within the "drop-in speed" of this transmission, most likely when the left front tire and undercarriage contacted Mr. Rod and his body blocked further rearward motion. (F.W. King 9/15/03 Report attached as **Exhibit 4**). In fact, Plaintiff has hired another expert witness, Mr. Ron Huston, who has devoted considerable effort to testing this analysis, but whose work is not the subject of the current Motion.

no evidence that Rosenbluth's "momentary neutral" condition exists. Rather, the transfer case control strategy will not let the shift motor stop in a position where the output shaft is not engaged in either 4WD low or 4WD high. In fact, Ford submits that Rosenbluth did not fully grasp the significance of the way this motor works until the middle of his deposition, at which time he began talking about a mechanical "skip lock" of the transfer case as the culprit. (See, e.g. Appendix "C" ).

The transfer case is designed so that the position of the output shaft and shift motor is at all times measured and known by the shift motor's encoder. And, under no set of conditions tested, did the shift motor in Mr. Rod's truck allow the transfer case to stop in a position where the vehicle would roll freely. (*See,* FMC Design Analysis Engineer J. Engle 3/31/04 Report, attached at **Exhibit 4**). Nor has Ford ever encountered another customer complaint, a dealer report, a lawsuit, or any similar account of a similar truck equipped with this ESOF transfer case having *any* problem which allowed it to override transmission park and roll unintentionally, or to experience unwanted "neutral" conditions. (*Id.*)

Finally, there is a police investigation which tells us two paramount truths about this incident which the police have accepted as part of their investigation:

First, testimony that Mr. Rod exited his vehicle with the transmission in *Park*, explaining the discrepancy between the dashboard light and the range selection dial, and further telling us that two of the required inputs for the shift motor to activate and begin moving, were most likely not present (See, generally, Appendix "C"). If the motor is not moving, then it cannot *stop* moving in the wrong place at the wrong time.[8] Nor is there any proof in the record the transfer case can mechanically "skip" in and out of locked positions in its quest to change gears, as

---

[8] And, even when in motion, the strategy for the motor controller will not allow the motor to stop in position which will allow the vehicle to roll freely.

92350.2

Rosenbluth has most recently suggested. Nor, were the motor, the shift forks, or other parts of the transfer case found to be "broken" in a hard, permanent manner. If that had happened, the transfer case would *not* have worked successfully to shift the vehicle drive range more than 100 times after this incident.

Second, the fact that the 4WD low light went *out* when Crime Scene Investigator Cegielski started the vehicle in **neutral**, when the vehicle was transferred to the impound lot, and while the selector switch was in the 2WD position, is a further validation of the sound performance of this ESOF transfer case on the very night of this occurrence. That is, when properly cued by an operator, this exact transfer case could (and did) immediately and correctly respond, without any "skip lock" or transient "neutral". (See generally, Appendix "A" and "C".)

Mr. Rosenbluth's version of what happened to Mr. Rod's simply will not "fit" these facts, regardless how he tugs or pulls them. And, no amount of techno-babble should detract this Court from the conclusion that what Mr. Rosenbluth has knit together here is an exceedingly poor fit.

### 5. ROSENBLUTH'S CREDENTIALS DO NOT QUALIFY HIM TO TESTIFY ABOUT COMPLEX TRANSFER CASE DESIGN QUESTIONS.

*Wilson v Woods*, 163 F. 3d 935, 937 (5th Cir., 1999) exemplifies the common sense approach taken by the Fifth Circuit Court when the "clothes don't make the man". Rosenbluth is bare of even the most basic engineering or science training. He admits he is not an engineer and that his degrees (a Bachelor of Arts and a Masters) were awarded by the Arizona State University's School of Education. He further admits to no practical experience in automotive design, no prior analysis of transfer cases of this kind (even in the litigation context) and no design experience with similar products. Thus, even his opinions about the operational features of the automotive drive train system and its components are suspect. He has offered no credentials in the area of design, manufacture, testing or development of transfer case

92350.2

technology, electrical motor controllers, ESOF transfer cases or any of the myriad lesser parts of this system he indicts. He has repeatedly demonstrated either ignorance or disingenuousness about how key portions of the system actually work.

Gerald Rosenbluth is a professional witness who has a great deal of experience *testifying*, but no meaningful experience *testing* products in a manner that would assist the trier of fact in this case. He should be required to put on something more than a decent necktie and a long litigation pedigree before being allowed into the witness stand to give opinions ranging from failure to warn to duty to recall about a product he had never apparently encountered before signing on in this lawsuit. In short, this Court should not allow Gerald Rosenbluth to cloak what is nothing more than rank speculation, guess work and mere advocacy from scrutiny simply because he has been allowed to do it so many times before.

## IV.

### CONCLUSIONS AND RELIEF REQUESTED

WHERFORE, PREMISES CONSIDERED, Ford Motor Company respectfully requests the opinions of Gerald Rosenbluth relating to design defect, warnings and causation, enumerated above, be stricken pursuant to the Federal Rules of Evidence and under *Daubert v. Merrell Dow Phar., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), and that Plaintiffs be prohibited from discussing or offering these opinions in any form at trial, and for further and other relief, at law or in equity, to which it may also have shown itself entitled.

92350.2

Respectfully submitted,

**DAVID M. PRICHARD**
State Bar No. 16317900
(210) 477-7401 – Direct Line

**DWAYNE R. DAY**
State Bar No. 00795314
(713) 520-2992 – Direct Line

**PRICHARD, HAWKINS & YOUNG, LLP**
2727 Allen Parkway, Suite 1605
Houston, Texas 77019
(713) 527-8800 – Telephone
(713) 524-8175 – Telecopier

**ATTORNEYS FOR DEFENDANT,
FORD MOTOR COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of November, 2004, a true and correct copy of the foregoing was hand-delivered to the following counsel of record:

Jim M. Perdue, Jr.
THE PERDUE LAW FIRM, L.L.P.
Wortham Tower
2727 Allen Parkway, Suite 800
Houston, Texas 77019
**Attorneys for Plaintiffs**

Dwayne R. Day

92350.2

UNITED STATES DISTRICT COURT OF
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHELLE ROD, INDIVIDUAL AND | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF RANDALL ROD, DECEASED, AND AS | § | |
| NEXT FRIEND OF BRIAN ROD, MINOR, | § | |
| ANGELA ROD, INDIVIDUALLY, | § | |
| BETHANY ROD, INDIVIDUALLY, AND | § | |
| LORRAINE M. ROD, INDIVIDUALLY | § | |
| | § | |
| VS | § | C.A.NO. 03-CV-5382 |
| | § | |
| FORD MOTOR COMPANY | § | |

# APPENDIX "A"

## FORD MOTOR COMPANY'S
## MOTION TO EXCLUDE AND/OR LIMIT EXPERT OPINIONS FROM
## PLAINTIFFS' WITNESS GERALD ROSENBLUTH

### The Significant Facts

The significant facts about this event were primarily gathered some time after Mr. Rod

climbed under the truck, several hours after his wife last spoke with him. (M. Rod Depo., 17:7-

21, 26:22).[1] Mr. Rod was not with anyone on his errand that evening,[2] so no one can tell us for a

fact that he was experiencing *any* problems within his vehicle which inspired him to climb under

his truck. Mr. Rod's body was discovered lying partially under the truck. (M. Rod Depo.,

---

[1] In this, and the following two Appendices, ford has cited the Court to specific deposition testimony of several fact witnesses involved in the investigation of Mr. Rod's death: MCSO Crime Scene Investigator Ike Cegielski; MCSO Detective Sgt. William Bucks; MCSO Deputy Kelley Smith; Fireman Matthew Francis; MCSO Maintenance Supervisor Thomas Mills; and the decedent's wife, Michelle Rod. Ford has, therefore, contemporaneously with this Motion, caused copies of the original sealed transcripts to be filed with the Clerk.

[2] Mr. Rod last spoke to his wife between 5 and 6 pm on the evening he died. He told her of plans to pick up cattle from the farm they owned and take them to auction. An auction receipt establishes that he did go to the auction and returned to Montgomery County after that call. The police discovered tire tracks leading from the concrete drive through a pasture gate and down to the area where the cattle, a barn and a trailer were kept. One office observed an area of disturbed ground that looked as though a vehicle had been stuck there. There was mud on Mr. Rod's tires, wheels and under his truck. From this the police "concluded" he had been down in the pasture with the truck, gotten his vehicle stuck, spun his wheels to churn up the ground, gotten unstuck, and driven back up to the driveway before parking and exiting the vehicle.

92350.2

37:14). Because Mr. Rod was unresponsive, Mrs. Rod called 911; fire, emergency medical teams and law enforcement responded. A detailed police investigation by Crime Scene Investigation and Detective Units of the Montgomery County Sheriff's Office ("MCSO") followed. (M. Rod Depo., 42:14).

This investigation establishes *only* that Mr. Rod had apparently parked his vehicle on the concrete driveway of a farm he owned in Montgomery County: *but not why he did so*. The truck's nose was found pointed uphill, generally facing the east, on a slight downhill slope of about 6 degrees. (MCSO CSI Cegielski Depo., 18:7-10, MCSO Det. Sgt. William Bucks Depo., 16:17-25). The vehicle's engine was found running. (M. Rod Depo., 40:1-3,). The headlights were on (MCSO Deputy K. Smith Depo.,10:24, 11:9), the driver's door was left open (EMT M. Francis Depo., 8:3-25), the interior lights were on (*Id.* 22:22, 23:8) and the stereo was playing (M. Rod Depo., 40:13-16).

Mr. Rod's body was lying in a prone position with his legs extending from the area beneath the driver's door, and his head, shoulders and torso beneath the vehicle and *behind* (i.e. downhill of) the left front tire and front axle (Det. Sgt. Bucks Depo.16:18, 17:25). His right arm/shoulder and a portion of his right midriff were pinned under the left front tire. His right hand was gripping a black Maglite® type flashlight, but it was turned so that his grip was near the handle end while the lamp end was pointed *away* from his truck's undercarriage. The first responders determined that Mr. Rod was deceased after closing the driver's door to reach him. (M. Francis Depo., 8:13 - 9:2). Once it was determined that Mr. Rod was beyond help, Fireman Matt Francis reopened the driver's door and turned the ignition key to the "off" (or "locked") position, stopping the motor. He admits he did this before any police arrived or any forensic investigation began. (*Id., See also,* 10:18-11: 18; 11:24-12:12).

92350.2

The next person to turn the engine on that night was MCSO Det. Sgt. William Bucks. Under power, the vehicle did not attempt to move:  it did not lurch back like it was in reverse, nor did it lurch forward as though it were in some other gear. (Det. Sgt. Bucks Depo., 29:2-20). Moreover, when Sgt. Bucks took his foot off the brake, the truck did not try to roll as if it were in neutral. (*Id.*, 29:11-25).

Next, MCSO Chief Crime Scene Investigator, Ike Cegielski, observed the vehicle's "PRNDL" indicator to be in the "**P**" (Park) position, and that the ***parking brake was not set.*** (Cegielski Depo., 32: 6 - 33:17). He tried to confirm that the vehicle was found that way and had not been touched. (*Id.* at 18:17 - 23). No one admitted to putting the vehicle in "Park" before the police arrived.

Rescue workers and police then chocked the rear wheels and attached a winch line to the front bumper (K. Smith Depo., 11:12 - 24; 14:23 - 15:6, M. Francis Depo.,14:17 - 15:9), and lifted the truck to extract Mr. Rod. (Cegielski Depo., 29:11-32:5) The vehicle was set down in its original position. (Cegielski Depo., 29:11-30:25)  CSI Cegielski closely watched this entire process, specifically to see if any of the wheels would free spin in any direction while the tires were off the ground. They did not. (*Id.*, 29:11-30:9)  Nor did the vehicle move when it was set back down. (*Id.*, 31:23-25) Rather, the wheels remained locked in "Park," even after Mr. Rod's body was removed from underneath.

Prior to removing the truck to the police impound lot, CSI Cegielski decided to conduct certain tests at the scene.  In his words, he wanted to see "*...if it [the F-350] rolled back excessively enough to where it would go up on top of somebody, if there were travel, the distance enough to do that.*" (*Id.*, 54:15-18).  Cegielski did not find ***any*** evidence that the vehicle was never placed in Park, that the vehicle was in Park and somehow "popped" into Reverse, or that

92350.2

the slope allowed for an excessive amount of "rollback" once the vehicle was parked. (*Id.* at 64:19-65:15).[3]  While he found the vehicle would experience perhaps "*3 or 4 inches*" of immediate backwards motion on the driveway slope when initially placed in "Park", it was "*nothing that [he] would consider excessive*", just "*about what's normal for any vehicle.*" (*Id.*, 17:18-18:1).  Not only was it a very short distance, the rollback was immediate: these tests ruled out the notion that Mr. Rod could have exited the vehicle and placed himself beneath it before any "normal" rollback occurred.

Throughout his investigation, CSI Cegielski was looking for signs of mechanical malfunction (*e.g., id.* 9:5-12), but he found none: not when he first walked around the vehicle (*Id.*); not when the vehicle was lifted off Mr. Rod (*Id.*, 29:11-31:3) and not during his own testing at the scene. (*Id.*, 23:1-15, 16:15-22:25)  In fact, during his testing --- CSI Cegielski found there was *no* problem shifting this vehicle into, or out of "Park" (I. Cegielski Depo., 20:4-9) and, that once placed in "Park", the transmission stayed there and the vehicle stayed put. (*Id.*, 20:10-12).  In sum, this vehicle's transmission performed exactly as Investigator Cegielski expected.  In his words, "*...my initial assessment was I believed that it was operating as I would expect any vehicle to operate*". (*Id.* at 23:13 - 15).[4]

Detective Sergeant Bucks was the first person to restart the vehicle that night.  And, while he recalls he probably had his foot on the brake, he did not attempt to shift the vehicle out of Park, the gear in which it was found. (Bucks Depo., 27:3 - 25, 29:2 - 20). He was also the first person who testified: "*. . .[I] observed the dash light to show the vehicle was in the 4 X 4 low*

---

[3]  In general, Cegielski restarted the truck for the second time since Mr. Rod was found, then used the gearshift lever to move the vehicle's transmission into and out of "Park" gear, repeating his test on the order of three (3) to four (4) times.  Each time he did so, he would first shift the vehicle into gear, allow it to move forward or backward, then put it into "Park" and take his foot off the brake to "see if there was any excess travel in the vehicle after you put it in Park". (*Id.*, 17:22 - 23) (*Id.* at 22:5 - 19).

[4]  Interestingly, CSI Cegielski also owns an automotive repair shop and State inspection business with his father, and has been "in the repair shops since [he] was 12 years old" (*Id.* at 50:10-19).

range and noticed that the inside selector switch showed the vehicle to be in two-wheel drive." (Bucks Depo., 28:19 - 22). [As the Court will see, this single, early investigatory observation has become the focal point of Plaintiff's entire theory and the underpinning of Rosenbluth's shifting theories of transfer case defect.]

In the early morning hours of Saturday, May 6, 2000, the Sheriff's investigators put the truck in "Neutral," then used a winch to pull the truck onto a flatbed-type ("rollback") wrecker for transport to the MCSO impound lot. (Cegielski Depo., 24:4 - 25). Upon arrival, at the impound, the engine was keyed on for the third time since Mr. Rod was found, only this time something different and very significant happened: CSI Cegielski testified: ". . . *And at that point I had to put my foot on the brake to depress it and turned the key on and noticed the [4 X 4 low range] indicator light was still on. And then I put it [the transmission] into Neutral and rolled it back off the -- after he lowered the bed, I stayed in the vehicle and let it roll down the incline.*" (Cegielski Depo., 26:21-27:2) Next, he placed the vehicle in "Drive" and drove it 15 - 20 feet to the impound building. (*Id.,* 26:18 - 27:18). Once again, the vehicle did not roll back or move differently than CSI Cegielski expected. (*Id.,* 28:8 - 10). But, the indicator light went out.

On Monday morning, May 8, 2000, Det. Sgt. Bucks, inspected the vehicle at the impound building, along with a vehicle maintenance mechanic named Mike Chevalier. In Det. Sgt. Buck's words; "*Mr. Chevalier hooked the truck to a New Generation Star Tester to check the diagnostics of the truck to see if any malfunctions had occurred*". (MCSO's Supplemental Report, Case No. 00A006672\4). Detective Buck's report goes on to state, "*...the Star Tester showed that the vehicle passed all tests and did not store any recent malfunctions*". In deposition, Det. Sgt. Bucks further explained that "numerous" diagnostic checks were done. (Bucks Depo., 33:20 - 24)

92350.2

- 27 -

Thereafter, on June 19, 2000, the vehicle was released from police custody to Mrs. Rod's brother-in-law, who came to claim it "accompanied by two civilian technicians who performed numerous tests" on the vehicle.  (*Id.*, 40:8-12).[5]

Then, on October 21, 2003, over forty-one (41) months *after* the night of this occurrence, and some 40 months after the vehicle was returned to the Rod family, the vehicle was partially disassembled by Gerald Rosenbluth, whose opinions are the subject of this Motion.[6]

---

[5]  No evidence of the results of that "testing" have ever been disclosed to Ford and it is therefore anticipated that this testing did not support Mr. Rosenbluth's theory.

[6]  Representatives of the Ford Motor Company were also present at this time, and observed Mr. Rosenbluth's activities, as well as the same physical evidence, components and systems about which Mr. Rosenbluth intends to testify.

92350.2

UNITED STATES DISTRICT COURT OF
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHELLE ROD, INDIVIDUAL AND | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF RANDALL ROD, DECEASED, AND AS | § | |
| NEXT FRIEND OF BRIAN ROD, MINOR, | § | |
| ANGELA ROD, INDIVIDUALLY, | § | |
| BETHANY ROD, INDIVIDUALLY, AND | § | |
| LORRAINE M. ROD, INDIVIDUALLY | § | |
| | § | |
| VS | § | C.A.NO. 03-CV-5382 |
| | § | |
| FORD MOTOR COMPANY | § | |

# *APPENDIX "B"*

## FORD MOTOR COMPANY'S
## MOTION TO EXCLUDE AND/OR LIMIT EXPERT OPINIONS FROM
## PLAINTIFFS' WITNESS GERALD ROSENBLUTH

### FORD'S PRODUCT

Ford supplied this 1999 model F350 pickup truck with an option commonly referred to as an "electronic shift on the fly" ("ESOF") 4-wheel drive system, an innovation which replaced the strictly mechanical transfer cases previously used. There are two key components in the vehicles' drive train for purposes of this lawsuit: one which allows the driver to select a gear (transmission) and one to select a drive range (transfer case). These components are found "in line" along the drive train: that is, one behind the other between the engine, where the power is generated, and the wheels, where the rubber meets the road.

Simply put, the operator in the cab "tells" the vehicle what gear he wants by shifting the vehicle with its shift lever, causing activation of a set of mechanical linkages going into the vehicle's transmission. The transmission, through a set of mechanical gears, engages that gear. The transmission then sends a power signal out, along the drive shaft, into the transfer case where a drive "range" is engaged: this determines whether power will go out to the rear axle and

92350.2

wheels only (the 2-wheel drive "range") or to both axles and all four wheels in either 4-high range (4 H), or 4-low range (4 L) when more torque (pulling power) is required.

Therefore, by design, a transfer case comes into play *only* when the transmission is in a condition which allows the drive signal to come out of the transmission and go into the transfer case. If a driver chooses the "P" or Park position on the shift lever (also called the "PRNDL" indicator in some instances), then the signal coming out of the transmission and going into the transfer case is telling the vehicle that all four wheels should be locked. Inside the transfer case, however, it is *also* necessary that the range gears be engaged so that the signal to lock the wheels can continue out of the transfer case to the appropriate wheels. It would not matter if the transfer case was in a 2-wheel or 4-wheel drive range (or if it were a mechanical or electronic design), just so long as the mechanical connection continues out of the transfer case to the wheels. The vehicle would stay where it was, even on a grade like the one involved in this case, and even if the truck were left running. That is, the vehicle's wheels would all be locked and unable to roll.

Earlier generations of heavy duty diesel trucks like Mr. Rod's were equipped with *mechanical* transfer cases which had *four* range positions: an operator could choose 2-wheel drive (2W), Neutral (N), 4-wheel high (4H), or 4-wheel low (4L). *By design, a mechanical transfer case has a "Neutral" range (or gear).*[1] What is *never* made clear to this Court in Mr. Rosenbluth's reports, however, is that this *F350 pickup transfer case has eliminated the traditional "neutral" gear: in fact, for purposes of this lawsuit, the critical difference between the mechanical and electronic designs is that the electronic system is a three-gear configuration. That is, it does not have a selectable "Neutral" position, by design.* This

---

[1] And, if the operator selected the "Neutral" position in the mechanical transfer case, the power "in" signal from the transmission would be disconnected from the power "out" side of the transfer case, and even if the driver placed the transmission in Park, the wheels would be unlocked and potentially free to roll due to gravity, vibration of the vehicle or other factors.

92350.2

transfer case *cannot* be inadvertently or deliberately placed or "left" in Neutral gear by the driver. Electronic transfer case technology strives to *eliminate* that potential for operator error and the risk of roll presented when a *mechanical* transfer case is left in mechanical Neutral, because an electronic transfer case is designed to *always* be "in gear".

The ESOF transfer case, which was assembled into the Rod truck, is an OEM part.[2] Of course, even though it is an "electronic" component, it still has some mechanical parts and works like this: the operator turns a rotary switch (a "dial") on the instrument panel to make one of three choices: 2H, 4H or 4L.[3] That choice sends an electronic "signal" along wires to the transfer case electric motor, telling it which drive range to select. If the driver wishes to go from 2H to 4H, he can do so "on the fly", *i.e.,* while the vehicle is still moving. However, if the operator wishes to get into (or out of) the 4L range (as these Plaintiffs claim Mr. Rod must have been doing shortly before he got out of his truck) there is a *three-step input which must be followed,* so that the component known as the "GEM" (Generic Electronic Module, *i.e.,* the "electronic brain" of this system) will send the necessary electrical signal to the electric motor on the transfer case housing. This is what the engineers call the "strategy" of the motor controller. The motor will not get a signal, nor will it be energized, unless all three inputs (also called "shift constraints") are met: (1) the vehicle must be *stopped* (defined as 0 to 3 mph), (2) the brake pedal must be *depressed,* and (3) the *transmission* must be shifted into *Neutral* by moving the

---

[2] That is, Ford purchased it from a supplier called New Venture Gear and installed it in this truck. Plaintiffs have chosen not to sue New Venture.

[3] When the operator turns the dial to 4WD high or 4WD Low, *and the required input conditions are met,* the shift will be accomplished inside the transfer case and one of two corresponding lamps on the instrument cluster will light up, informing the driver that transfer case is now in the selected drive range. The light *will not* illuminate unless the shift is completed inside the transfer case. (Engle Report, 9-16-03 at **Exhibit 4**). The light will remain illuminated during operation of the vehicle in that drive range. Similarly, and of significance here, the lamp will not extinguish until the transfer case shifts successfully *out* of that range. Much of Mr. Rosenbluth's speculation and theory in this case revolves around the fact that Sergeant Bucks of the MCSO observed in the early part of the investigation that the "4WD Low" lamp was illuminated on the dash of the Rod truck at the scene, but someone had turned the rotary switch to the "2WD" position. (But see, generally, Appendix "C").

92350.2

gearshift lever to the "N" position. (J. Engle Depo. of 8/13/03, 44:11-45:50).  If those three input conditions are *not* followed, the GEM doesn't send *any* signal to the transfer case and the transfer case motor is never engaged, so the transfer case will remain in its current range. (J. Engle 8/13/03 Depo., 15:13-21)

The GEM also controls the movement of the transfer case motor once the signal has been sent.  Once engaged, the motor moves a mechanical rail-like component (called the "range shift sleeve" or "range selector") through a series of gears (called "mode" forks or "range shift forks"), which represent the three available drive range conditions.  Basically, the motor causes the rail to pass through the forks, and then stop only upon successfully shifting: *i.e.*, reaching one of the three available ranges.  (This allows the power out of the transfer case, along the drive shaft, to the correct wheels.)  Thus, no matter which range you start in, or which direction the rail is traveling, by design, *this transfer case is designed to always be engaged, never in a non-engaged, or what Rosenbluth repeatedly characterizes as a "Neutral" position.*

As the rail moves between the 4L and 4H range positions there will be an instant in time where the rail will necessarily pass "between" stops, even if the transfer case works 100% correctly.  That interval is extremely brief:  it takes about 60-70 milliseconds (Engle Report, 9-16-03), or roughly one third (1/3) as long as it takes to blink your eye to travel across that space.  An additional layer of safety is built in as the software ("the motor encoder") also detects five (5) intermediate positions between the 4L and 4H ranges as it moves from one to the other. (J. Engle Depo., 80:10 - 81:22).  The electronic logic of the GEM tells the transfer case to return to one of these positions (a safe harbor) if for any reason it cannot engage a new gear.  That is, as the transfer case is attempting to complete a shift, and should the encoder detect any problem accomplishing the shift to the next measured position, it will cause the motor to move the range

92350.2

shift sleeve up or down to the intermediate position which it just departed. Somewhat like leapfrogging across a pond on stepping stones, the motor will not leave the range shift sleeve "hanging in midair," but is designed to always return it safely to the closest safe spot: an engaged position where it will not be free to roll. (*See, e.g.,* Engle 8/13/03 Depo., 115:16 - 119:4; 26:12 - 23).

Thus, Ford's evidence is that vehicles equipped with this ESOF transfer case *will not* roll when the transmission is in "Park" (as Mr. Rod's vehicle was), in the absence of a *catastrophic failure* inside the transfer case (Engle 8/13/03 Depo., 29:11 - 18; 30:7-25). A "catastrophic" failure of the transfer case means a "hard" failure, one that is permanent, and not self-correcting. In common parlance, something would have to "break." This might be a complete breakdown of the motor, or if "the gears had completely come apart within the transfer case". (*Id.*, 30:4-6) And, if a part had failed in such a hard and permanent manner, it would still be broken (and non-functional) today. It would not have functioned properly at any later time.

Plaintiffs do not dispute that the truck's transmission was in "Park" when Mr. Rod was found. (*See, e.g.,* Rosenbluth Report, July 22, 2004, pp 6 attached at **Exhibit 1**) Nor can Plaintiffs dispute that on the night of the incident, the transmission and transfer case both worked just fine when used or tested by the Montgomery County Sheriff's Office. Nor can Plaintiffs point to any fault codes stored in the onboard diagnostic modules indicating a shift malfunction.

Similarly, for months afterward, this transfer case was found to operate normally and correctly to transfer the drive range between 2 H and 4 L and between 4H and 4L. In fact, many months after the event, engineers analyzing this occurrence for attorneys representing Ford Motor Company conducted experiments on Mr. Rod's vehicle and found that the transfer case was *still* "operating as designed" with "no instances of improper or failed operation even after

92350.2

conducting *more than 100 shifts* from low to high and high to low" on a down grade equivalent to the one in this event. (J. Engle 3/31/04 Supplemental Report of Findings, attached at **Exhibit 4**) The transmission, too, was tested *more than 300 times* and each time properly engaged and restrained the vehicle on the slope. (FMC Design Analysis Engineer Frederick W. King, 9/15/03 Engineering Report, pp. 2, ¶2 attached at **Exhibit 4**). Even as late as the October 21, 2003 "tear down" of the transfer case, Ford's "examination revealed that the transfer case functioned in a correct way so that it would not allow the vehicle to move in a manner consistent with those reported in this event" and "there was no problem observed in the electronic shift motor". (*See,* e.g. Carr Engineering, Inc. 3/31/04 Report, ¶5, attached at **Exhibit 4**) Thus, there is overwhelming proof this 1999 F350 pick up *never* experienced a hard, catastrophic or permanent failure of the transfer case, and has experienced no "intermittent" or "momentary" failures either. Simply put, it worked every time it was tried -- well over 100 times -- and was *not* observed to be broken when it was taken apart in October, 2003.

UNITED STATES DISTRICT COURT OF
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHELLE ROD, INDIVIDUAL AND | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF RANDALL ROD, DECEASED, AND AS | § | |
| NEXT FRIEND OF BRIAN ROD, MINOR, | § | |
| ANGELA ROD, INDIVIDUALLY, | § | |
| BETHANY ROD, INDIVIDUALLY, AND | § | |
| LORRAINE M. ROD, INDIVIDUALLY | § | |
| | § | |
| VS | § | C.A.NO. 03-CV-5382 |
| | § | |
| FORD MOTOR COMPANY | § | |

# *APPENDIX "C"*

## FORD MOTOR COMPANY'S
## MOTION TO EXCLUDE AND/OR LIMIT EXPERT OPINIONS FROM
## PLAINTIFFS' WITNESS GERALD ROSENBLUTH

### BACKGROUND SUMMARY: PLAINTIFFS' "EXPERT" ANALYSIS OF PRODUCT DEFECT

At the outset of his involvement in this case, Gerald Rosenbluth admitted that he could find nothing mechanically wrong with this vehicle. In his own words:

> *"The subject vehicle **did not exhibit significant factors or defects** relative to operating systems specifically including, but not necessarily limited to, the steering, breaking, suspension, drive train, safety systems and body foundational componentry that can be considered contributory elements to the causation of the accident given the understanding of the incident facts at this time **with the exception of the 4 X 2 ◇ 4 X 4 H ◇ 4 X 4 L drive range selector electromechanical controls** inclusive of the 'generic electronic module' [GEM] and related control programming functions with respect to durability, reliability and repeatability."* **(See Exhibit 1**, Rosenbluth Report, 2/25/2004, "Discussion", pp 6, ¶ 3) *(emphasis added)*.

In plain English, Mr. Rosenbluth made a choice to narrow his focus in this lawsuit to the truck's ESOF transfer case, and in specific, to the electronically (GEM) controlled *motor* which causes the range shift selector to move. He reached these conclusions *in the absence of any evidence whatsoever* of a hard, catastrophic and permanent failure of the transfer case, its motor,

92350.2

its electronic (GEM) controller or any other component. Moreover, he puts forth this theory *empty-handed of any evidence that the phenomenon can be validated:* either recreated by experimentation in the lab, or by experience in the "real world".[1]

Rather, he just leaped to the naked conclusion that:

> "...This subject vehicle is **defective and unreasonably dangerous** with respect to the 4 X 2 <> 4 X 4 H <> 4 X 4 L transfer case range selection electromechanical control unit function as it relates to design, manufacture, assembly and/or performance durability and reliability in that **the transfer case shift selector control unit has the potential to exhibit a hold or sudden, unexpected, inadvertent and catastrophic electro-mechanical momentary neutral event** as was more likely than not achieved in the transfer case, which **override** and **momentarily nullified** the transmission "park" mode and caused the subject vehicle to roll in reverse unpowered on a 6%+/- downgrade in a mechanically limited trajectory, suffocating and expiring Mr. Rod."

(**Exhibit 1,** Rosenbluth Report, February 25, 2004, "Conclusions and Opinions", pp 7, ¶ 1) *(emphasis added).*

The Court will surely note here that this defect opinion is liberally salted with an unhealthy dose of vague superlatives and adjectives, but is also absolutely without any meat: the "defect" is "sudden", "unexpected", and "inadvertent". (*Id.* at pp 7). This condition occurred *only* while Mr. Rod was lying underneath the truck, and manifested itself *only* "momentarily"; just long enough to override the transmission 'park' mode. (*Id.* at pp 7). He characterizes the fleeting "defect" as both "intermittent" and "momentary". (*Id.* at pp 7). Taken together, Mr. Rosenbluth is saying that this "defect" was not a permanent condition in the transfer case: it came, then it went, never to be seen again.

Most notably absent from Mr. Rosenbluth's analysis is *any* evidence that he has been able to *replicate* this elusive, transient "defect" in the subject transfer case, or in any surrogate transfer

---

[1] *Ford has not encountered **any other claim**, complaint, lawsuit, dealer report or other instances of an owner or operator of an F250/350 with the ESOF transfer case experiencing a problem with the transfer case which allowed it to roll unintentionally. (See,* **Exhibit 4,** Engle 3/31/04 Supplemental Report of Findings).

92350.2

case. He directly admitted to his inability to do so in his later deposition. (*See, e.g., **Exhibit 2**, Rosenbluth Depo. 91:3-11*)

It is historically significant that Gerald Rosenbluth was *third* in the line of experts retained by these Plaintiffs to proffer a "defect" opinion about the truck. In the beginning, there was Neil Mizen who placed all the blame on the transmission, *not the transfer case*.[2] Before Mr. Mizen came Simon Tamney (now deceased), who so far as Ford knows never made a report of *any* alleged "defect" as the cause of this event.

From the outset of Rosenbluth's involvement in this case, he was a man in search of a theory. Rosenbluth's difficulty is evident early in his retention, as his initial report, which he made July 2003 concluded merely, and in a legally insufficient fashion, that:

> "...the transfer case shift selector control unit has **the potential** to exhibit a
> sudden, unexpected, inadvertent and catastrophic electro-mechanical
> momentary neutral event as was more likely than not achieved in the transfer
> case, which overrode and momentarily nullified the transmission "park"
> mode..." (*See*, **Exhibit 7**, Rosenbluth Report, 7/14/03)

(**Exhibit 1**, Rosenbluth Report, 7/14/03, pp 5, ¶ 1) (*emphasis added*). Rosenbluth's talk of a "*potential*" defect gave Ford no technical or scientifically grounded explanation of how this

---

[2] Mizen opined that the vehicle's transmission was in a condition he called "illusory" Park prior to the time that Randall Rod crawled behind the vehicle's wheels and tires. He then opined the truck's transmission somehow slipped into a full powered *reverse* while Rod was under there, causing the vehicle to back over him under full power, rather than roll onto him. The most significant problem with Mizen's theory (other than the fact that it is completely inconsistent with Mr. Rosenbluth's theory) is that Mizen offered no explanation for how the shift lever could have returned to the latched "park" position after the vehicle traveled over Mr. Rod. The Montgomery County Sheriff's Department report clearly states that the vehicle shift lever was found in the "park" position. And, apparently, Mr. Rosenbluth does not dispute that finding. Moreover, members of the Sheriff's Department vehicle maintenance staff testified that the shift lever was *locked* in the "park" position. (See, e.g. Tom Mills Depo.) The vehicle's transmission was tested at the scene numerous times. Crime Scene Investigator Ike Cegeilski started the vehicle and shifted it from reverse to park numerous times to observe the amount of roll back that the vehicle exhibited when he released the brake after returning the vehicle to the "Park" position. Although the vehicle rolled back "a few inches," Cegielski considered this amount of roll back to be normal on that slope. This rearward movement was estimated to be "one to three" inches by Montgomery County Det. Sgt. William Bucks, who observed Investigator Cegeilski's tests. Plaintiffs have also offered a report from another "expert", Ron Huston, who states the vehicle rolled "rearward before pinning Mr. Rod", a distance of some "*eighteen inches* (as suggested in the expert and investigative reports)". (**Exhibit 1**, R. L. Huston Report, October 28, 2003, pp 3 - 4)

92350.2

"potential" was realized in the death of Mr. Rod. He merely pointed to a *single observed fact* from the police investigation: the "4 X 4 low" range light on the dashboard was illuminated when the Sheriff's Officers first *restarted* the vehicle at the scene, while the truck transmission was locked in *"Park"*, even though the rotary switch was turned to the "2WD" position. (*Id.*) Based on this single element, (which, as discussed below, has simpler explanations than the tortured logic of a transient "defect" lurking in the transfer case), Rosenbluth took the colossal, ungrounded and ill-considered leap which he has been trying to justify ever since:

> "...Suggesting *within a reasonable degree of scientific and technological probability that the transfer case gear selector mechanism produced the above described intermittent and momentary neutral mode event which would be inconsistent with OEM design and/or performance intent.*"

( *See, Exhibit 1, Rosenbluth Report, 7/14/03, 5:¶ 1*).

Nothing could be further from the truth. This observation about the dash light in *no way* suggests that the transfer case was defective to the exclusion of all other explanations. Rather, this is exactly the result that one would expect if an operator tried to shift from 4L TO 2WD *without* also simultaneously depressing the brake peddle and shifting the transmission into *Neutral*. (See, generally, Appendix "B", "Ford's Product" and discussion therein). Rosenbluth acknowledges this is the required procedure to cause the transfer case motor to come into operation. (**Exhibit 2**, Rosenbluth Depo, 107:4-108.17)

Rosenbluth presumes to know the Rod vehicle's transmission was in "Park" when Mr. Rod got out. If Rod was alone, he must also presume Rod was the one who turned the range selector switch to 2WD *and* placed the vehicle in *Park*. That finding means it is just as likely that Mr. Rod *did not* perform the necessary steps to occasion a shift of the transfer case immediately before stepping down from his truck. As discussed in detail in Appendix "B", without these shift constraints, *the GEM software will not send a signal to the transfer case*

92350.2

*motor to begin moving for a range shift.* Thus, the transfer case motor would *not* be receiving a signal to change positions when Mr. Rod left his truck: *the motor would not be energized or trying to move.* Mr. Rosenbluth knows that *if* Mr. Rod did *not* enter the proper shift constraints, then the motor would never try to shift at all and his theories go up in smoke. (See, **Exhibit 2**, Rosenbluth Depo., 153:22-154:2) Thus, the presence of that dashboard light, coupled with the police testimony, tells us it is *just as likely* that as Rod left his truck the shift motor was stopped, *not* energized, and *not* trying to move out of 4W Low.

In his haste to make the presence of this "4x4 Low" indicator light "evidence" of a malfunction, however, Rosenbluth would further mislead this Court and jury by *omitting another* key piece of the puzzle: Sheriff's investigators discovered, upon reaching the impound building in the wee hours of Saturday morning,[3] that *the 4-wheel low range light was no longer illuminated.* (Cegielski Depo., 60:21 - 61:6; Bucks Depo., 35:16 - 20) .

The "4X4 Low" indicator light continued to shine each time investigators *at the scene* turned the key to the "on" position, simply because *at no time did any Officer at the scene input the three, underline(simultaneous) steps necessary to cause the transfer case motor to start moving and shift the vehicle into the 2WD position selected on the rotary switch* (*i.e.*, foot on the brake, vehicle speed less than 3 mph and transmission in Neutral). Rather, to a man, each Officer testified that he used some combination of the "Park", "Drive" and "Reverse" gears while keying the vehicle on. *None of the investigators at the scene placed the vehicle into Neutral.* Indeed, it would only have been "evidence" of a malfunction in the transfer case *if the indicator light had gone "off"* during the on scene investigation, given that no one at the scene used proper

---

[3] As earlier noted, Mr. Rod died on May 5, which was a Friday. In the early morning hours of Saturday, May 6, the vehicle was transferred to the police impound. The following Monday, May 8, the vehicle was inspected at 9:30a.m. by Sgt. Bucks. The vehicle remained under lock and key until that time. (Cegielski Depo., 28:3 - 5).

92350.2

inputs to cause the transfer case to shift. *It was only when CSI Cegielski started the vehicle, in Neutral*, with the brakes applied, in order to unload it from the wrecker *after* transport from the scene, *that the conditions were first met to cause the shift.* (*See, e.g.,* Cegielski Depo., 26:18 - 27:2; 60:21 - 61:6)(**Exhibit 4**, Report of FMC Design Analysis Engineer F. W. King, 9/15/03, ¶12). And, then, exactly as Ford would expect, the vehicle immediately shifted into 2WD as commanded, and the dash light went out. (Cegielski Depo., 60:21 - 61:6)

Contrary to Rosenbluth's initial "defect" opinion, then, both the fact the light was initially **on**, and the fact the light went *off* when Cegielski input the appropriate shift constraints, tells us three critical truths about this incident:

(1)    that, on the night of this event, the transfer was operating *exactly* as designed;

(2)    that the vehicle's transfer case was working correctly immediately *after* the occurrence, and was capable of operating normally to move from 4WD low into the two-wheel drive range; and,

(3)    most importantly, the most likely and reasonable deduction from the evidence is that the transfer case motor *did not* receive a signal from Mr. Rod prior to the time he left the vehicle, the motor was not energized, *and consequently was not trying to move the transfer case into a new drive range* at the time Mr. Rod placed himself beneath the vehicle.

These three truths take on overwhelming significance, however, when analyzing Mr. Rosenbluth's reports, and deposition in this case, *because the central premise of all his theories has been that the transfer case motor was energized and moving, attempting to change the drive range,* when the alleged "momentary" transient neutral state occurred.

92350.2

- 40 -